UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES DIVISION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) ) | |
| Plaintiff, | ) ) | 2:13 CV 18-PPS-APR |
| v. | ) ) | |
| INDIANA HARBOR BELT RAILROAD COMPANY, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Brotherhood of Maintenance of Way Employees Division of the International Brotherhood of Teamsters accuses Indiana Harbor Belt Railroad Company of racial discrimination and harassment in the work place. The Union seeks both monetary and injunctive relief. Indiana Harbor Belt moves to dismiss all claims claiming that the Union does not have standing to pursue these claims on behalf of its members. For the reasons below, I now **GRANT IN PART** and **DENY IN PART** Indiana Harbor Belt's Motion to Dismiss Plaintiff's First Amended Complaint [DE 35]. I **GRANT** the motion with respect to the Union's request for economic and punitive damages, but **DENY** the motion with respect to its request for injunctive relief.

### FACTUAL AND PROCEDURAL BACKGROUND

As usual, I'll start with the grim facts as alleged in the complaint, which I accept as true at this point in the case. The plaintiff union is a railway labor organization who works on behalf of its members in the areas of "grievances, labor disputes, rates of pay, hours of employment or

conditions of work, and [] negotiating collective bargaining agreements." [DE 34 at ¶ 2.] Indiana Harbor Belt is a railroad company based in Hammond, Indiana, that employees the Union's members. [*Id*. at ¶ 2, 6.]

The Union claims that Indiana Harbor Belt has subjected its African-American employees to "a hostile work environment of such intensity as to result in their constructive discharge." [*Id*. at ¶ 13.] According to the complaint, Indiana Harbor Belt has engaged in the following practices: preventing its African American employees from training for higher-rated (and higher-paying) positions, instead giving those opportunities to its non-African-American employees [i*d*. at ¶ 14]; applying a disparate disciplinary policy against African-American employees [*id*. at ¶ 20]; treating African-American employees more harshly than white employees, resulting in the "systematic elimination of African-American new hires" and causing the makeup of Indiana Harbor Belt's workforce to be disproportionate to the racial composition of the relevant labor market [*id*. at ¶ 21]; failing to recall African-American employees after workforce reductions [*id*. at ¶ 25]; and allowing white employees to arrive late to work while not allowing African-American employees to do the same [*id*. at ¶ 26]. And although Indiana Harbor Belt has an anti-discrimination policy in place, the Union alleges that Indiana Harbor Belt has failed to advise its employees of this policy and to correct discriminatory actions. [*Id*. at ¶ 15.]

The Union further alleges that Indiana Harbor Belt's agents and supervisors have engaged in the following disturbing behavior including systematically referring to African-American employees as "N_ _ _ _ _" [*id*. at ¶ 17]; displaying a Swastika tattoo [*id*. at ¶ 18]; referring to mixed-race children of African-American employees as "half-breeds" [*id*. at ¶ 19];

referring to white employees who associate with African Americans as "N_ _ _ _ _ lovers" [*id.* at ¶ 28]; asking white employees who drink "particular-flavored soft drinks" why they drink "N_ _ _ _ _ juice" [*id.*]; and displaying a noose in a company vehicle [*id.* at ¶ 29].

The Union initially filed its Section 1981 and Title VII lawsuit against Indiana Harbor Belt in January 2013, seeking class action certification [DE 1]. Indiana Harbor Belt filed a Motion to Dismiss and/or Strike Plaintiff's Class Allegations [DE 15], and in response, the Union sought to consolidate the matter with other two other cases pending in this district [DE 21; DE 22]. Both of those cases were brought by individual employees against Indiana Harbor Belt and they make similar allegations to those made in the present case. The motion to consolidate was ruled on by Judge Van Bokkelen who denied the request [DE 25]. I then denied the pending motion to dismiss the class allegations in this case as moot and permitted Indiana Harbor Belt to re-file its motion [DE 29].

Indiana Harbor Belt did so [DE 30], and in lieu of responding to the motion, the Union requested leave to file an amended complaint removing the Rule 23 class allegations [DE 32]. I granted this request, granted the Defendant's Motion to Dismiss and/or Strike Plaintiff's Class Allegations, and ordered the Clerk to enter the proposed First Amended Complaint attached to the Union's request. [DE 33] Indiana Harbor Belt has now moved to dismiss the first amended complaint on the grounds that the Union lacks standing to pursue its amended claims. [DE 35]

## DISCUSISON

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this stage I must accept all allegations as true and draw all reasonable inferences in the complainant's favor, but I don't need to accept threadbare legal conclusions supported by mere conclusory statements. *See Iqbal*, 556 U.S. at 678. So under *Iqbal*, I must first identify allegations in the complaint that are not entitled to the assumption of truth by, for example, disregarding legal conclusions. *Id*. Then I must look at the remaining allegations to determine whether they plausibly suggest an entitlement to relief. *Id*. Determining whether a complaint states a plausible claim for relief requires me to draw on my judicial experience and common sense. *Id*. at 679.

Indiana Harbor Belt asks me to dismiss complaint for one main reason: the Union can't pursue this action on behalf of its members because it lacks associational standing. In essence, Indiana Harbor Belt argues that the suit will require participation from each of the Union's members, negating the Union's ability to bring the suit on behalf of its members. Indiana Harbor Belt is half right. The Union can't pursue the claims for damages on behalf of it employees, but it can seek an injunction. Indiana Harbor Belt's motion will therefore be denied in part and granted in part.

**Associational Standing**

The concept of standing refers to whether a party may properly pursue its case in court; namely, whether the court has jurisdiction over the matter. Article III, Section 2 of the Constitution limits my jurisdiction to "Cases" or "Controversies" where "the plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a

4

favorable judicial decision." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386 (2014). In other words, the plaintiff must present me with a problem likely caused by the defendant that I have the authority to fix.

In general, I have authority over only those problems suffered by the actual party bringing the suit. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). One exception, however, is that an association or organization may bring suit on behalf of its members, even where the organization itself has suffered no injury. *Id*. at 511. This is "associational standing" and it exists only where an association can show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The first two of *Hunt*'s requirements are based directly on Article III's requirements, while the third is prudential, meaning that I have discretion as to how it is applied. *Milwaukee Police Assn. v. Bd. of Fire & Police Commissioners*, 708 F.3d 921, 928 (7th Cir. 2013) *citing United Food & Commer. Workers Union, Local 751 v. Brown Grp., Inc.,* 517 U.S. 544 (1996). Even so, my discretion is guided by three broad principles: "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Intern., Inc.*, 134 S.Ct. at 1386 (internal citations and quotation marks omitted).

Indiana Harbor Belt does not challenge the first two prongs of the test for associational standing [*see* D.E. 36 at 5], so all that remains for me to determine is whether the third *Hunt*

5

prong—that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"—is satisfied.

## Rule 23 Class Certification

At the outset, I need to dispose of a strawman argument Indiana Harbor Belt puts forward before I delve into the substance of the motion. Indiana Harbor Belt makes a lot of the fact that the Union's amended complaint is virtually identical to its original complaint asserting class-based claims, going so far as to accuse the Union of a "procedural sleight of hand" [D.E. 36 at 1] by dropping its class claims and instead pursuing its suit in an organizational representative capacity. But the law on this point is clear—an association need not proceed under Federal Rule of Civil Procedure 23 to have standing to sue on behalf of its members. *Int'l Union, United Auto. v. Brock*, 477 U.S. 274, 289 (1986); *Retired Chicago Police Assn. v. City of Chicago*, 7 F.3d 584, 600 (7th Cir. 1993). Indeed, class certification under Rule 23 and associational standing are evaluated on two different rubrics and "although Rule 23 may provide a useful analogy in some cases in which an organization represents its members, it is not controlling." *Local 194, Retail, Wholesale, and Department Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 867 (7th Cir. 1976). In other words, just because an organization cannot meet the requirements of Rule 23 class certification, it does not mean that the organization will automatically also *not* qualify for associational standing. Such a rule would wholly negate an organization's recognized ability to sue on behalf of just one of its members because in those instances, an organization would be unable to meet the requirements of Rule 23 such as numerosity, common-question, and typicality. *Id*. That the Union has removed its class claims is therefore of no consequence to the issue at hand.

## The Union's Claim for Damages

The Union has already essentially conceded that its claim for damages requires too much

7

participation by individual members to satisfy *Hunt*'s third prong [*see e.g.* DE 39 at nn. 2]. With good reason: claims for damages are generally "not common to the entire membership, nor shared by all in equal degree" and therefore require individualized proof where the organization itself has suffered no monetary harm. *Warth,* 422 U.S. at 515-16; *accord Local 194*, 540 F.2d at 865 (union has no standing to seek "individualized forms of monetary relief" on behalf of its members). I will therefore **DISMISS** the Union's claim for economic and punitive damages.

### The Union's Claim for Injunctive Relief

The narrow issue I must resolve, then, is whether the Union has associational standing to request that I issue an injunction against Indiana Harbor Belt on behalf of the Union's members to remedy alleged race discrimination under Title VII of the 1964 Civil Rights Act and Section 1981 of the Civil Rights Act of 1866. I conclude that it does.

Associations generally have standing to pursue injunctive relief on behalf of their members. *Warth*, 422 U.S. at 515 ("If . . . the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). More specifically, unions generally have standing to represent members in discrimination claims asking for injunctive relief:

> [T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all.

*Brock*, 477 U.S. at 290 (internal quotation marks omitted); *accord Local 194*, 540 F.2d at 866

(finding union has standing to pursue injunctive relief for Title VII claims on behalf of its members and that "[t]he effectiveness of these suits can be increased by allowing unions to place their financial resources and expertise behind the suit."). And contrary to Indiana Harbor Belt's assertion [D.E. 36 at 8], standing does not fail merely because of a conflict between union member interests. *Local 194*, 540 at 866 ("Often a union finds itself in the position of representing a membership whose interests conflict, not only in Title VII cases but in its collective bargaining role. This does not disqualify it from acting at all." (internal citation and quotation marks omitted)).

Under *Hunt*, associational standing does fail where "the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S. at 343. What constitutes such individual participation has been the subject of some debate and confusion. And as the Seventh Circuit has observed: "While the *Hunt* test is well-established in our jurisprudence and enjoys the specific reaffirmation of the Supreme Court in *Brock,* the application of the various prongs has, to this date, produced a caselaw that does not lend itself to easy distillation." *Retired Chicago Police Assn.*, 7 F.3d at 600.

While this area of the law is a bit murky, what is clear is that *some* participation by individual members in a lawsuit is permissible so long as not *all* of the members need to participate. *Id*. at 601-02. How could the rule be otherwise? How would an association *ever* be able to make a Title VII case, for example, without some aggrieved member of the association talking about it? This sensible approach follows the *Warth* Court's holding that "so long as the nature of the claim and of the relief sought does not make the individual participation of *each* injured party indispensable to proper resolution of the cause, the association may be an

9

appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511(emphasis added). As the *Retired Chicago Police Association* court observed:

> We can discern no indication in *Warth, Hunt,* or *Brock* that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association. Such a stringent limitation on representational standing cannot be squared with the Court's assessment in *Brock* of the efficiencies for both the litigant and the judicial system from the use of representational standing.

*Id*. at 601-02. This makes sense because if the rule required zero individual participation, then associational standing would not exist because an association could bring a suit only when it was harmed, eviscerating the purpose of the doctrine.

Indiana Harbor Belt claims, however, that the injunction the Union seeks "cannot be accomplished without significant individualized proof and testimony" [DE 40 at 4] because I will have to "inquire about each member's race, what department they worked in, who was their supervisor, and to what actions (noose) or comments ('N _ _ _ _ _', 'mixed-breed', 'half-breed') they were subjected." [DE 36 at 8]. I disagree. Although it is unclear exactly what the Union is requesting I do by way of an injunction, the Union's allegations paint a picture of a system-wide pattern or practice of alleged discrimination. And discrimination claims of this type do not require proof from each individual and are instead evaluated at the liability phase on objective criteria establishing a company-wide pattern-or-practice of discrimination. *See e.g. Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 360, (1977) ("At the initial, 'liability' stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy."); *Puffer v. Allstate Insurance Co.*, 675 F.3d 709, 716 (7th Cir. 2012) ("Pattern-or-practice claims require a showing that an employer regularly

and purposefully discriminates against a protected group. Plaintiffs must prove that discrimination was the company's standard operating procedure—the regular rather than the unusual practice." (internal citations and quotation marks omitted)); *Allen v. Int'l Truck & Engine Corp.*, No. 1:02-CV-902-RLY-TAB, 2006 WL 694345 at * 1 (S.D.Ind. 2006) ("In a pattern-and-practice case, a plaintiff must show that, given the totality of the circumstances, an objectively reasonable person would find the existence of: (1) a hostile environment of racial harassment within the company (a hostile environment pattern or practice); and (2) a company policy of tolerating a workforce permeated with severe or pervasive racial harassment." ).

The Union points me to a case that really drives home why it is unnecessary for each the Union member to participate in this litigation. In *Employees Committed for Justice v. Eastman Kodak Co.*, the plaintiffs accused the defendants of racial discrimination in various employment practices and of maintaining a hostile work environment involving instances remarkably similar to those alleged by the Union, such as the use of racial slurs including the n-word and depictions of African-Americans hanging from nooses. 407 F.Supp.2d 423, 430 (W.D.N.Y. 2005). The defendants argued that the organization could not maintain associational standing on behalf of its members because proving discrimination under Title VII generally, and a hostile work environment specifically, required individual, subjective proof. *Id*. at 428-29. In rejecting this argument, the court stated that "the liability phase of the hostile work environment or retaliation claim will not hinge on subjective and 'individualized proof,' but rather the existence of a pervasive system-wide pattern or practice or discrimination that is equally harmful and applicable to all members of the protected class." *Id*. at 433-34.

The court further observed:

> [I]t is not necessary for each class member to introduce evidence that he or she found it "subjectively unwelcome" to be called "nigger" or "black boy" or be taunted by racist graffiti and depictions of African-Americans hanging from nooses posted in work lockers, elevators and bathrooms in order to demonstrate the existence of a pervasive, systemic and widespread hostile work environment.

*Id.* at 430. Although not controlling in this matter, I find the reasoning of the court to be both persuasive and helpful, particularly given that there isn't a lot of Seventh Circuit precedent addressing what level of individual participation may be required in a Title VII or Section 1981 claim brought by an association. That it would be unnecessary to hear from each and every individual affected that various racial slurs, depictions, and other such discriminatory treatment was unwelcome just makes common sense.

## CONCLUSION

In light of the foregoing, I will **GRANT** the Motion to Dismiss Plaintiff's First Amended Complaint [DE 35] with respect to the Union's request for economic and punitive damages, but **DENY** the motion with respect to the Union's request for injunctive relief. The Union need not file an amended complaint reflecting this ruling.

**SO ORDERED.**
ENTERED: May 6, 2014

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT